Okay, our first argument is Herod's Stone Design v. Mediterranean Shipping Company at all. Mr. Cohen, are you on the line? I am, Your Honor. Great, and you can see the judges and you can hear us? I can, thank you very much. Okay, and then we have two lawyers for the appellees. Mr. Pallas. Pallas, are you on mute, perhaps? Yes, Your Honor. I believe I was. I apologize. I can hear you and I am here and good morning. So we can't see you. Is it possible that your camera is not on? If you touch the screen toward the top, there could be something that says video with a little line through it. Oh, maybe down below here. I apologize. That's all right. It makes me feel better. While you're doing that, let me just make sure that Mr. Merrick is also on the line. Mr. Merrick? Good morning, Your Honor. Okay, I can see you and I can hear you. So we're just not seeing Mr. Pallas. Oh, now we are. All right, there you go. Perfect, thank you. All right, so I allotted 12 minutes for each side. Mr. Cohen has reserved three minutes for the appellees. Mr. Pallas will go for seven minutes and Mr. Merrick for five. Is that right? Correct. Very good, Your Honor. All right, so Mr. Cohen, the floor is yours. Good morning. May it please the court. My name is Michael Cohen. I am the attorney for a plaintiff appellant, Eric Stone Design. Your Honors, we maintain that the decision dismissing this action should be reversed for the several reasons put forth in our briefs. I would like to start with a brief explanation of the key facts as they directly go to the issue of the case, which is whether COCSA preempts my client's exclusively state-based claims. We take the position that COCSA can only act as a contractual term in this case and therefore could not preempt our claims. Plaintiff appellant Harrods shipped goods with MSC on a way built from China to California where the cargo was discharged from the ship and condition was luckily documented in pictures by MSC that the cargo be transferred to New Jersey by rail. MSC admits that after the cargo was discharged from the ship, the container needed to be split into two. Let me ask you. I think we know what the facts are. When I read the briefs, I was focused on the Kirby case. I don't understand. It seems to me that Kirby precludes many, if not all, the arguments that you're making with respect to the facts here. Can you explain to me why Kirby doesn't control here? We have distinguished Kirby and some of the other cases that were cited by the district court in that those cases referenced a through bill of lading and also those cases did not deal with negligence. On the through bill of lading, the Seaway bill is a through bill of lading. In a case called Royal and Son in 2010, we said a Seaway bill is like a bill of lading except the bills of lading are negotiable, which way bills are not. In Sampo, Japan, we said through bills cover the entire journey from start to finish, including both the ocean and the land legs. And clearly, that's what this way bill did. It covered both the ocean and the land legs. So it is a through bill. So, Your Honor, it's our position that this way bill was terminated in California. It was only once it landed in California that arrangements were made with MSC to ship it by rail to New Jersey. The way bill dealt with the entire journey, right? The way bill spoke to the entire journey. So in many of those cases, the distinction was made, first of all, where the sea portion was a substantial component of the transit. Well, isn't that true here? I mean, Kirby involved a rail derailment. It's exactly this factual scenario where the damage occurred on land. The Supreme Court said this is a maritime case, federal law that you can apply COGSA to the land part of the transport, and it preempts law. The facts in Kirby are identical to these. So it is our position that, first of all, in those cases, the ultimate destination on the way bill was, in fact, the location, which in this case would be in New Jersey. But in this case, the way bill, the destination was California, not New Jersey. So on that fact alone, it is distinguishable. And yet another distinction that we made in our briefs was the fact that none of those cases dealt with negligence, whereas our case alleges negligence, just like the case in Colgate. The district court took the position that Colgate was overruled by Kirby, but we distinguished those cases based exclusively on the fact that Colgate was a case where negligence was ultimately proved and alleged by the plaintiffs, whereas those cases negligence was not a factor. So we argue that not only would 1301E render this as a contractual term and not expropriate with regard, but the fact that negligence was alleged, which would under 13038 render this case- I don't understand. Where's the carve out for negligence? Kirby does not carve out. It preempts state law except for negligence claims. It would be contrary to the forward and overtake maritime law, right? Where's any Kirby that there's this pocket of negligence cases that can proceed, notwithstanding a through bill. So your honor, we don't argue that there is such a carve out, but we believe that that's what distinguishes Colgate and the reasoning of Colgate from all those other cases. But in Sampo, Japan, we said Kirby overruled Colgate. We said that in footnote 17 of Sampo, Japan, that Kirby would appear to effectively overrule cases like Colgate. So you're relying on Colgate for this negligence point, but we've already concluded that Kirby changed the landscape. So it's our position, your honor, that Colgate is still being cited by many courts for the position that once the goods are discharged, that the operational COCSA is a contractual matter. It does operate, but it operates by contract and not expropriatory. The relevance of that is, and we believe that that element of Colgate still is good law. And if it does operate not by its own force, but by contract, it does render this matter a state-based claim and not a maritime matter. But what in the contract leads you to think that negligence is not covered or that this thing ended in California? What are you pointing to? Well, the actual way bill itself. I mean, if we look at the actual way bill itself, the way bill terminates in California. It does not have a through carriage to New Jersey. I'm trying to open the actual way bill, but the way bill that's submitted is not a through way bill. It terminates in California. It was only separately arranged for the goods to be transported by rail to New Jersey. And to answer your honor's other question with respect to negligence, there is nothing in the contract with respect to negligence. We make the argument that to the extent that COPSA is being applied, that 13038 would nullify any of those protections with respect to the negligence. What is the destination that's provided in the way bill? California. I'm trying to pull it up right now because I had it in front of me and it just froze. So sorry. Oh, it's right here. Sorry, I can't read on my screen, but it says Long Beach, United States, which is California. That's the port of discharge. Oh, but I mean, again, what's contemplated is that this is not going to just end in California, right? That this, I mean, this is going beyond that, right? Initially it wasn't. And I, and I believe that that's why the reasoning of Kirby is not applicable here. And it was originally, it was supposed to terminate in California. And then it was later arranged between MSC and, and appellant to be transported by rail through BNSFF. But wasn't it provided at the outset that MSC would deliver the cargo to New York? So originally the intention was to have it delivered in California where a plaintiff has, where appellant has one of its distribution centers. It was only once it landed in California that it made arrangements with MSC to have it transported by rail. So you're saying that the Seaway Bill did not, that in the Seaway Bill, MSC did not undertake responsibility for delivering the goods to New York? Correct. It was supposed to terminate in Long Beach, California. And that only changed upon the arrival of the goods in California. There was sudden, the party suddenly decided that they were going to go to New York. Correct. That's my understanding. All right. But at the request of Herod or its agents, the Seaway Bill was amended through to reflect an intermodal carriage, right? Through carriage from China to the port of delivery in New York. Respectfully, I wouldn't view that as an intermodal arrangement. It was a separate arrangement. It wasn't, it certainly wasn't arranged while it was on, in transit or, or while it was on the carrier. Well, I'm just going through the appendix here now, but I see that you are out of time. Maybe we'll get some help from Appellee's Council on this. And you've reserved three minutes for rebuttal, Mr. Cohen. Mr. Pallas, maybe you can address some of those factual questions. Yes. Good morning, Your Honor. William J. Pallas for the Appellee MSC Mediterranean Shipping Company SA. May it please the court. Our position is that the arguments that have been presented in this appeal are neither novel nor unique. And as Your Honors have just pointed out and addressed with Appellee's Council, are really governed and determined by the Supreme Court's decision in Kirby. In fact, these issues have really been settled as a matter of maritime law, established maritime law for almost 20 years now, going back to the Kirby decision in 2004. The fact is, despite the representations to the contrary, Appellant filed suit against MSC for damage to cargo shipped under a through bill of lading from China to New York. Appellant has acknowledged that it contracted with MSC for carriage from China to New York, both in its motion papers that were filed both in the Southern District and earlier in the District of New Jersey, and most importantly, in the Rule 56.1 statement. I refer the court to Special Appendix pages four and five, which are the relevant provisions in the 56.1 statement. So regardless as to how Appellant tries to finesse its relationship with MSC, the fact is that Herod's entered into a through contract of carriage from China to New York. In terms of Your Honor's question regarding what happened here factually, there was an initial bill of lading issued for, or seaway bill issued for carriage from China to Long Beach, California. Herod's, through its agents, requested that carriage be amended all the way through to New York. MSC issued an amended seaway bill, which the court may at Special Appendix 78, which clearly references New York as the final point of delivery. So, Council has tried to distinguish and desperately avoid the application of Kirby by making a number of arguments, one of which that this wasn't a substantial maritime component. It simply is not the case. Again, as Your Honors have pointed out, the facts here are almost identical to Kirby. We've got ocean carriage followed by intermodal rail carriage. Kirby involved the train wreck. Well, we don't have a train wreck in the literal sense. We have cargo damage during inland transport from California to New York. Let me just ask you about Colgate. Do you think Colgate's distinguishable or do you just think it's overruled by Kirby? I believe Colgate, to the extent that it holds that state law was applicable, has been overruled by Kirby, as confirmed by the Second Circuit in the Sampo case. So, essentially, the case is on four corners with Kirby. You know, the court was clear that federal maritime law will govern these intermodal contracts of carriage, that federal law will supersede state law, and that, you know, if that were not the case, essentially, it would allow appellants, such as Herod, to circumvent the contract of carriage and circumvent federal maritime law. I realize my time is flying by here. A few other points, just to address some of the arguments that were raised by appellant. The issue regarding the irrelevant, again, as your honors have pointed out, a seaway bill. The only distinction between a seaway bill and a negotiable bill of lading is that a seaway bill, obviously, is not negotiable. However, parties are free and often do, I should point out, a seaway bill is very common in the marine industry. They incorporate COGSA as part of its terms contractually. This was addressed squarely by Judge Torres, page 26 of her decision. She noted that the seaway bill must be addressed just as any other contract, and the principles of contractual law would apply, but those principles are federal maritime law principles, and they allow for the enforcement of the time bar defense and the package limitation defense, all of which are clearly incorporated in the MSD seaway bill terms and conditions. Counsel, when you refer to the amended seaway bill, which provides for the carriage of the goods to New York, that is a contract. Is Herod's stone design a signatory? Your honor, so under Kirby, a party such as Herod's may contract with the ocean carrier through intermediaries, and that's what they did in this case. Okay, but the intermediary, their agent, it's the same thing. Their agent was signatory to this. Correct, your honor. They actually contracted through two intermediaries and, therefore, are bound under Kirby by the terms of the bill of lading. Is that their claims manager? No, your honor. It was a freight forwarder or an NVOCC. It was an entity called Go Forward Freight Company, I believe, and they, in turn, contracted with an NVOCC by the name of Parisi. But it's essentially the same fact pattern as Kirby, whereby they contracted with the ocean carrier and bound by those terms. How did Herod's become bound? By what chain of agency? Well, first of all, your honor, they admit this in the complaint and also in the rule 56.1 statement that they contracted with MSC through these intermediaries. So they contracted through Go Forward, who, in turn, contracted with Parisi, who hired MSC to move the cargo. There's also a line of cases, your honor, as we cite in the brief, whereby when a plaintiff files suit on a bill of lading, they're bound by the terms and conditions, which they clearly did in this case. Just to address quickly, your honors, if I may, this issue regarding negligence. There obviously is no carve out under either Kirby or under COGSA for negligence claims. If that were the case, the Maritime Bar would be out of business. Cargo cases, COGSA cases often involve, almost always involve some degree of negligence, cargo being dropped, stolen, frozen, thawed, etc. Mr. Thomas, let me just, can I just ask you a quick question about the equitable stopboat in case it comes up on rebuttal. I'm not familiar with all these documents, what a formal statement of claim is. I saw things in the record, emails from the shipping agent, just July 11th, 2016, that has, it seems like, information and documentation related to the claim. So I'm curious, what is a formal statement of claim and what does it have different than what's in those emails? Yes, your honor. So it was simply an MSC requirement. They had a form that they wanted Herod's to fill out, setting forth various information about the claim. There's a particular form? That's my understanding, your honor. And, you know, they kept asking Herod's claim agent to submit it. Obviously, there was a disagreement between the parties, as your honor would see in the emails. But if I may address that equitable estoppel issue. So the issue there, your honor, is the parties had gone back and forth by email over the course of several months. This cargo was delivered in July, 2016. The equitable estoppel argument is essentially undermined by the declaration of Mr. Abe Foleman, Herod's claims agent. And he makes two critical admissions in that declaration. The first is, he acknowledges that really the last substantive communication between himself and MSC was on May 17, 2017. And at that point, he was told by MSC that they still needed this formal claim statement. In his declaration, he says that he told MSC at that point, look, you're playing games with me. You're looking for a technicality to get out of liability. So it's clear at that point that there was a disagreement between MSC and Mr. Foleman on behalf of Herod's as to where those negotiations stood. At that point, Herod still had two months to either or almost two months to either file suit or request a suit extension. They did neither of those things. Rather, they let the time bar lapse. And then they didn't file suit until some eight months later in March, 2018. The other critical admission he makes in that document, he says, at no point did MSC offer me, quote unquote, a penny on the claim. So clearly, there was no meeting of the minds here. There was no agreement. There was no lulling or equitable stop in the case. Herod's had ample time, almost two months, to protect their interests, and they failed to do so. Your Honor, we've also addressed the package limitation issue. And this will be my last point. I realize I'm running over my time here. The face of the Bill of Lading, which, again, the court can find it at SA 78, clearly identifies the shipment as 23 packages under the Second Circuit's decision in POPP, that description of the cargo, 23 packages, is essentially dispositive as to the number of packages that are at issue here. So as an alternative argument, which we did brief in the court below, we believe that regardless of any other issue in the case, there is a valid and enforceable package limitation defense here based on the 23 packages. That only matters if the statute of limitations defense doesn't prevent it, right? That's absolutely correct, Your Honor. It's our position. We should never reach that point. All right. Okay. Thank you, Mr. Pallas. We'll hear from Mr. Merrick for five minutes. Good morning, Your Honors. If it pleases the court, my name is Chris Merrick. I represent the Second Appellee BNSF Railway Company. We request that the court affirm the judgment of the district court for the reasons set forth in our briefing. And today, I'm just going to address one additional point in support of our position. We'll rely upon our briefing for the other points. And the reason, what I'd like to add is that we believe the judgment of the district court should be affirmed because even if you accept all of the arguments that Mr. Cohen has made today is true, that still doesn't lead to a cognizable cause of action against BNSF. Now, of course, here we agree with Mr. Pallas that this claim is completely controlled by COGSA and the Kirby decision. In addition to Kirby, the textual component of COGSA reflects that this distinction that Mr. Cohen is trying to make between a through bill and a seaway bill, it's a distinction without a difference. I mean, COGSA itself, as Judge Torres correctly identified, states that it applies to every bill of lading or similar document, which is evidence of a contract of carriage of goods by to or from ports of the United States or foreign trade. So here, there clearly is a contract of carriage for goods, whether how you title it is of no consequence to the determination here. But even so, even if you reach the port and there is a second shipment, as Mr. Cohen would have the court believe, again, we disagree with that. BNSF's liability still would not be governed by state law. It would be governed by the Carmack Amendment. That, as we've indicated in our brief, there's extensive precedent on that issue. It completely preempts any conflicting or contrary state law related to loss or damage during the interstate transportation of goods. And here, transportation from California to New York or New Jersey, whichever it happens to be, would clearly fall within that. So the state law claims to be preempted for that reason. Secondarily, even if there were a second way bill, and again, we disagree with the idea that there was, that second way bill still would have had the MSC terms that apply, that we didn't ever have a second contract or there are no other terms related to this inland carriage. In fact, the terms of the MSC way bill are cited in the plaintiff's complaint and all of their allegations against us. We prevailed on a motion to dismiss, so plaintiff's arguments are constrained by the four corners of their complaint. With that, they cite to the MSC way bill terms, and in those terms, there is an express prohibition against suit against subcontractors. So as a matter of contract, regardless of which law would apply, there's no dispute that that provision exists within the contract. There's no dispute that we are a third party beneficiary with the right to enforce it. There's no dispute that the court's prior ruling, and here there are two SOMPOs, we should be clear it's the SOMPO versus Norfolk Southern matter, has already spoken to the question of whether such clauses are enforceable from a public policy standpoint. So it's unclear even what the argument is. If COGSA doesn't apply, this negligence or purported negligence exception that Mr. Cohen has applied here doesn't even matter. So we believe that regardless of whether the court accepts Mr. Cohen's arguments are true, the arguments related to the claim filing deadline don't even come into play, and secondarily, there were no claims filed with us ever, so none of that matters to us. So we would ask that the court enforce the terms of the contract that the appellant sued and affirm the district court's decision in this case. All right. Thank you, Mr. Merrick. Mr. Cohen, you've got three minutes, and I guess it would be good to hear you respond to the fact that A, you sued under this contract, and B, there is a special appendix 78. I mean, that is the amended way bill, right? Executed by your agent. Your Honor, I apologize. I have a fax coming in, if you don't mind. I just don't want to disturb. So for whatever reason, I'm having trouble opening up the special appendix, but what I would respond to is as follows. Is that regardless of whether or not the state law claims are preempted by COGSA, the very fact that COGSA 13038 applies would apply to the tolling arguments that we made with respect to the statute of limitations. I first want to back up and address the formal claim document that was raised by Mr. Pallas. First of all, nowhere in the documentation or in the communications between the party did MSC ever provide such formal claim document. For that matter, it doesn't appear anywhere in the literature, in the terms, or on MSC's website where such formal claim document would be. But Mr. Cohen, I think you know, even if they're being unreasonable with respect to that, that doesn't mean there's equitable estoppel. There has to be something misleading about what they're doing as opposed to them being unreasonable in terms of what they're requesting. And I just want you to address the May 17th email, I think is pivotal because I think he accurately cited the back and forth. And it seems pretty clear that Mr. Fulman understood at that point they were playing, quote unquote, playing games. They weren't going to pay. And that was before the time ran. So why isn't that controlling? Whatever happened before that date, as of May of 2017, Mr. Fulman knew that there was no agreement for them to pay, right? Well, Your Honor, I mean, at the same time, Mr. Fulman also stated on the record that he felt he was being spun in circles and that at one point he was told that a check was being cut in the near future. The reality is that Mr. Fulman is an unsophisticated consumer. I mean, he doesn't really know exactly what's happening. And the fact that he continued communications through to the end where it was ultimately denied, if anything, shows the fact that he really didn't know what was going on. The reality is also that he brought suit within a year of that email. The fact is, is that he was locked into a certain sense of security, which is one of the standards. There was three tolling arguments that was made by the appellant. One was under New York's equitable tolling statutes, and one was made under COPSA cases that specifically stated that where a plaintiff was lulled into a certain sense of security, we would apply equitable tolling so that an unjust result would not occur. The lulling usually involves saying, we're not going to enforce that one-year provision. It's something more than just mere delay. There's something misleading about the application of that provision. And this wasn't even discussed. The provision obviously wasn't even discussed. So I would just add, if the court would allow, two things. First of all, we believe that the fact that the plaintiff was told that a check was being cut in the near future would create some sort of lulling. It did create some sense of security. And the second thing that I would add to that is the fact that MSC did, in fact, use the time bar to its benefit. And ultimately, it was tricked into allowing it to run afoul of the one-year mark. There's none of the case laws reference that the carrier had to promise that the time bar would be extended. The reality is that there was some sort of trickery here. They were asking for documents. And Mr. Fulman, in his affirmation, stated that he was being asked repeatedly for documents that he had already provided, that he was told it was just a formality. But when he challenged them why they were being asked for these documents repeatedly, he didn't get a satisfactory answer. But he did say that he felt like he was being spun in circles. Is it your position that Herod Stone Design's agents did not know what a formal claim document is? Yes, Your Honor. None was ever provided to them. I didn't ask that. I said, is it your position that your client's agents didn't know what a formal claim document is? Because I don't see them asking, see, what's that? I just see them not providing one, whatever it is. So, Your Honor, I believe that there was some sort of disconnect, because every time they asked for a formal claim document, he provided them the documents that he thought would amount to a claim. I'm quite certain that if he understood what a formal claim document was, it's a pretty simple document to provide. And there's absolutely no reason in the world why he wouldn't provide that, other than the was either being led, you know, to be confused with the situation. He was handed off, he said, to three different claims managers, was repeatedly asked for information that was already provided. We do believe that not only should equitable tolling apply, but we believe that, and this is something that has never been addressed by any court, that 13038 would also nullify the one-year shortened statute of limitations. It is a lessening of liability, and according to a lot of the cases that dealt with 13038 issues, any time a clause, a code of clause is used to absolve a carrier of liability in a case of negligence, those clauses are null and void. And our argument is that the one-year statute of limitations is a lessening of liability. And if you look at- It says otherwise than as provided in this act under Section 8, right? So that, doesn't that make clear that you can contract out of that? Well, I mean, that would apply just as well to the package limitations in that case. I know, but Kirby wouldn't exist if you're reading of Section 3-8, of Subsection 8, is accurate. Kirby couldn't happen, right? Well, Your Honor, as I stated previously, it's my impression that Kirby did not deal with negligence. All right. Thank you. Okay. We will reserve decision. Thank you.